UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JAMEDA MANAY WILLIS,

                Plaintiff,                Case No. 2:19-cv-11689
                                              Hon. Anthony P. Patti

v.

COMMISSIONER OF
SOCIAL SECURITY
ADMINISTRATION,

                Defendant.
_____/

**OPINION AND ORDER GRANTING IN PART AND DENYING IN PART
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT (ECF NO. 10),
GRANTING IN PART AND DENYING IN PART DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT (ECF No. 14), REVERSING IN
PART THE DECISION OF THE COMMISSIONER OF SOCIAL
SECURITY, and REMANDING THIS MATTER TO THE
COMMISSIONER**

I.      **OPINION**

      A.      **Background and Administrative History**

Plaintiff, Jameda Manay Willis, brings this action under 42 U.S.C. §§ U.S.C.

§§ 405(g) and/or 1383(c)(3) for review of a final decision of the Commissioner of

Social Security ("Commissioner") denying her applications for disability (DI) and

supplemental security income (SSI) benefits.  In her applications for SSI and DI

benefits, Plaintiff alleges that she became unable to work because of her disabling

condition on May 1, 2017 and May 15, 2017, respectively.  (R. at 170, 176.)  Her disability report lists several conditions (excessive daytime sleepiness, narcolepsy, acute migraines, and anemia) as limiting her ability to work.  (R. at 202.)  Plaintiff's applications were denied in October 2017.  (R. at 53-74, 80-113.)

Plaintiff requested a hearing by an Administrative Law Judge (ALJ).  (R. at 114-116.)  On March 6, 2019, ALJ B. Lloyd Blair held a hearing, at which Plaintiff, her counsel, and a vocational expert (VE) appeared.  (R. at 23-45.)  The ALJ issued an unfavorable decision on March 27, 2019, wherein he concluded that Plaintiff had the residual functional capacity (RFC) to perform light work, although with some postural and environmental limitations, as well as a limitation "to simple unskilled work that does not involve concentration on detailed or precision tasks, multi-tasking, computing, calculating, or problem solving."  (R. at 14.)

Plaintiff requested review of the ALJ's decision.  (R. at 167-169.)  On April 12, 2019, the Appeals Council denied Plaintiff's request for review; therefore, Plaintiff's June 6, 2019 appeal is timely.  (R. at 1-6, ECF No. 1.)

## B.    Pending Matters

Currently before the Court is Plaintiff's motion for summary judgment, which challenges the ALJ's treatment of Listing 11.02 and subjective symptoms. (ECF No. 10.)  The Commissioner has filed a cross-motion for summary judgment

(ECF No. 14), and Plaintiff has filed a reply (ECF No. 17).  Also relevant to the

Court's analysis is the administrative record.  (ECF No. 8.)

The parties have consented to my authority.  (DE 16.)  I conducted a

telephonic hearing on April 9, 2020, at which Plaintiff's counsel (Erika Ann Riggs)

and the Social Security Administration's Assistant Regional Counsel (Susan D.

Beller) appeared.  This case is now ready for decision.

### C.    Standard of Review

The District Court has jurisdiction to review the Commissioner's final

administrative decision pursuant to 42 U.S.C. § 405(g).  When reviewing a case

under the Social Security Act, the Court "must affirm the Commissioner's decision

if it 'is supported by substantial evidence and was made pursuant to proper legal

standards.'"  *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. at 2009)

(quoting *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. at 2007)); *see*

*also* 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner of Social Security as

to any fact, if supported by substantial evidence, shall be conclusive . . . .").  Under

this standard, "substantial evidence is defined as 'more than a scintilla of evidence

but less than a preponderance; it is such relevant evidence as a reasonable mind

might accept as adequate to support a conclusion.'" *Rogers*, 486 F.3d at 241

(quoting *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir.

1994)).  In deciding whether substantial evidence supports the ALJ's decision, the

court does "not try the case *de novo*, resolve conflicts in evidence or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007); *Rogers*, 486 F.3d at 247 ("It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant.").

Although the substantial evidence standard is deferential, it is not trivial. The Court must "'take into account whatever in the record fairly detracts from [the] weight'" of the Commissioner's decision. *TNS, Inc. v. NLRB*, 296 F.3d 384, 395 (6th Cir. 2002) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487 (1951)). Nevertheless, "if substantial evidence supports the ALJ's decision, this Court defers to that finding 'even if there is substantial evidence in the record that would have supported an opposite conclusion.'" *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)). Finally, even if the ALJ's decision meets the substantial evidence standard, "'a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers*, 582 F.3d at 651 (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007)).

D. **Analysis**

1. **Plaintiff sought treatment for headaches before her alleged onset date.**

In July 2014, Plaintiff was seen at Northwest Neurology for severe headaches, at which point migraine was "suggested by headaches that are throbbing, moderate to severe intensity, recurrent attacks, nausea and vomiting, photophobia and phonophobia."  (R. at 446-447.)  On August 3, 2015, she was seen at Associations in Neurology and reported, *inter alia*, that she had been "suffering with headaches for approximately one year[,]" "was started on Fioricet which is mildly helpful but *its efficacy appears to be decreasing*[,]" and "Sumatriptan 100 mg does not appear to work[.]"  (R. at 297-299 (emphasis added).)

Plaintiff presented at the hospital on June 24, 2016, but "eloped before being see[n] by a physician."  (R. at 330-331.)  Then, in April 2017, *the month before her alleged onset date*, Plaintiff presented to the hospital with complaints of migraine and inability to swallow.  (R. at 332-348.)  She was discharged the same day in stable condition with diagnoses including "migraine without status migrainosus, not intractable."  (R. at 343-344.)

## 2.  Her post-onset date records are marked by hospital and neurology visits.

Plaintiff's alleged onset date is May 15, 2017.  (R. at 176.)  She was seen at the Troy Sleep Center on May 16, 2017, on June 26, 2017 for a Multiple Sleep Latency Test (MSLT), and on June 29, 2017.  (R. at 301-313, 319-323, 368-376.)  In his polysomnography report, Dr. Alkhalil diagnosed "Mild obstructive sleep

apnea syndrome, severe in REM stage of sleep" and "History of excessive daytime sleepiness." (R. at 307-308, 319-320, 371-372.) Among other things, Dr. Alkhalil's MSLT report noted: "The mean sleep latency to all naps of less than 5 minutes, and the presence of REM stage of sleep in more than one nap make the diagnosis of narcolepsy more likely." (R. at 311, 323, 375.)

### a. Plaintiff went to Beaumont Hospital 3 times in 2017.

On July 8, 2017, Plaintiff presented to Beaumont Hospital for migraine. (R. at 349-357.) The notes indicate that typical migraine symptoms had started the prior evening and that "Patient has gotten no relief from fioricet at home. She has appointment with neurologist the end of the week." (R. at 352.) The neurological exam revealed that Plaintiff was "alert and oriented to person, place, and time," had "normal strength," "[n]o cranial nerve deficit or sensory deficit," and normal coordination. (R. at 355.) The final impression was migraine headache, although the records also state "[n]o diagnosis found." (R. at 355-356.) She was discharged on July 9, 2017. (R. at 356.) (*See also* R. at 328.)

The following month, on August 21, 2017, Plaintiff's treating physician, Wasim A. Qazi, M.D., completed a physical RFC questionnaire (MSS). Among other things, he noted that Plaintiff's migraine headaches occur more than 5 times monthly and that she was likely to be off-task 25% or more and absent from work "[m]ore than four days per month." (R. at 315-318, 450-453, 455-458.)

On December 4, 2017, Plaintiff went to the hospital for dizziness (fall), her neurological exam was positive for dizziness and headaches, a head CT scan revealed "[n]o acute intracranial hemorrhage or process is identified[,]" it appears she left against medical advice (AMA), but the final impression was "acute anemia with falls, recurrent dizziness." (R. at 387-397.) The following day, December 5, 2017, she again went to the hospital for dizziness. (R. at 398-410.) At this point, the Dix-Hallpike Test was positive and the final impression was benign paroxysmal positional vertigo (BPPV) / vertigo. (R. at 398, 401, 403, 404.)

The following month, on January 23, 2018, Plaintiff saw Dr. Qazi. (R. at 415.) Although the assessments included obstructive sleep apnea, migraine headache, and extreme dizziness, Dr. Qazi noted that the "CAT scan at Beaumont did not show any acute injury." (*Id*.)

### b.   Plaintiff saw her neurologist 4 times in 2018.

Plaintiff returned to Northwest Neurology on February 15, 2018, for "[s]evere migraines with fainting spells and feeling unbalanced[.]" (R. at 445.) Dr. Jenkins described her assessment as follows: "Migraines with and without aura. Basilar migraine is suggested by dizziness, loss of balance, and loss of consciousness or a sensation of being intoxicated. However, similar symptoms may also be due to narcolepsy which has been diagnosed elsewhere." (*Id*.) The

diagnoses included "Intractable basilar migraine" and "Intractable migraine without aura." (*Id*.)

Plaintiff saw Dr. Qazi on April 13, 2018. (R. at 413-414.) Plaintiff had normal spirometry, *i.e.*, pulmonary measurements. (R. at 416; *see also* Stedman's Medical Dictionary 838640.) Plaintiff's sinus bradychardia was "borderline abnormal," although with "unconfirmed analysis." (R. at 418.) Plaintiff's April 17, 2018 brain MRI revealed, "No definite acute intracranial process." (R. at 417.)

On July 25, 2018, she was seen at Northwest Neurology for a "follow up visit for severe migraine." (R. at 444.) Dr. Jenkins diagnosed "Intractable migraine without aura" and "Chronic migraine without aura, intractable, without status migrainosus." (*Id*.) The plan included "Aimovig for headache prophylaxis to be administered 70-140mg subcut on a monthly basis." (*Id*.) The following month, on August 16, 2018, Plaintiff saw Dr. Qazi, who assessed, *inter alia*, obstructive sleep apnea and narcolepsy. (R. at 412.)

She was again seen at Northwest Neurology on September 4, 2018 for "persisting migraines." (R. at 443.) Dr. Jenkins' notes indicate that Plaintiff derived no benefit from several drugs and had not obtained the recommended Aimovig. (*Id*.) Dr. Jenkins diagnosed "Intractable migraine without aura," and "Chronic migraine without aura, intractable, without status migrainosus." (*Id*.)

The plan included "Aimovig for headache prophylaxis to be administered 70mg subcut today and to be continued on a monthly basis." (*Id*.)

On December 13, 2018, Plaintiff had a follow up visit at Northwest Neurology for medication refills. (R. at 442.) Dr. Jenkins' notes indicate that "[f]or migraines, there is also no benefit with Zomig, sumatriptan, topiramate. She did not obtain the re[c]ommended Aimovig for prophylaxis." (*Id*.) Among other things, Dr. Jenkins diagnosed "Intractable migraine without aura." (*Id*.)

### 3.    The primary headache disorder ruling was inapplicable.

Plaintiff relies, in part, upon SSR 19-4p, which partially provides that "[e]pilepsy (listing 11.02) is the most closely analogous listed impairment for an MDI of a primary headache disorder[,]" and that "[w]hile uncommon, a person with a primary headache disorder may exhibit equivalent signs and limitations to those detailed in listing 11.02 (paragraph B or D for dyscognitive seizures), and we may find that his or her MDI(s) medically equals the listing." SSR 19-4P, 2019 WL 4169635, *7 (Aug. 26, 2019). (ECF No. 10, PageID.506-507.) During the April 9, 2020 motion hearing, Plaintiff withdrew her reliance upon Listing 11.02(D) and limited her equivalency argument to Listing 11.02(B).

The Commissioner correctly notes that this ruling became applicable after the ALJ's written decision, but acknowledges SSR 19-4p's "useful parameters,"

and argues that analysis under this ruling's parameters "fails to support medical equivalence to Listings 11.02(B) or (D)."  (ECF No. 14, PageID.539-541.)

### 4. Plaintiff has raised a substantial question that her impairment medically equals Listing 11.02(B).

The ALJ's Step 3 finding does not expressly address Listing 11.02.  (R. at 13-14.)  Although the ALJ determined at Step 2 that migraine headaches were among Plaintiff's several severe impairments, he found at Step 3 that "[t]he record does not establish the medical signs, symptoms, laboratory findings, or degree of functional limitation required to meet or equal the criteria of any listed impairment and no acceptable medical source designated to make equivalency findings has concluded that the claimant's impairments medically equal a listed impairment."  (R. at 12-13 (emphasis added).)  The only listing the ALJ expressly mentions is Listing 12.04 ("Depressive, bipolar and related disorders").  (Id. at 13-14.)

Plaintiff argues that she *medically equals* Listing 11.02 ("Epilepsy"), because she "has a non-listed impairment that is 'at least of equal medical significance' to a listed impairment[.]"  *Reynolds*, 424 F. App'x at 415 n.2 (citing 20 C.F.R. § 416.926; 20 C.F.R. § 404.1526).  (ECF No. 10, PageID.509; ECF No. 17, PageID.559.)  She bears the burden on this issue.  *Malone v. Comm'r of Soc. Sec.*, 507 F. App'x 470, 472 (6th Cir. 2012).

### a. Evidentiary requirements for medical equivalence

Plaintiff argues that "the ALJ erred by failing to obtain an expert medical opinion regarding medical equivalency as required by SSR 17-2p . . . ." (ECF No. 10, PageID.510 (emphasis added).)  SSR 17-2p explains that "[t]he adjudicator must base his or her decision about whether the individual's impairment(s) medically equals a listing on the <u>preponderance of the evidence</u> in the record." SSR 17-2P, 2017 WL 3928306 at *3 (emphasis added).  Moreover,

> If an adjudicator at the hearings or AC level believes that the evidence does not reasonably support a finding that the individual's impairment(s) medically equals a listed impairment, we do not require the adjudicator to obtain ME evidence or medical support staff input prior to making a step 3 finding that the individual's impairment(s) does not medically equal a listed impairment.

*Id.*, 2017 WL 3928306 at *4.

As this Court has explained, "under SSR 17-2p, an ALJ may find that a claimant does not medically equal a listed impairment without the support of a medical opinion[.]"  *Jammer v. Comm'r of Soc. Sec.*, No. CV 18-10445, 2019 WL 1372171, at *7 (E.D. Mich. Feb. 22, 2019) (Whalen, M.J.), *report and recommendation adopted*, No. CV 18-10445, 2019 WL 1354037 (E.D. Mich. Mar. 26, 2019) (Parker, J.).  *See also Anderson v. Comm'r of Soc. Sec. Admin.*, No. 2:18-CV-12334, 2019 WL 3933742, at *3 (E.D. Mich. Aug. 2, 2019) (Patti, M.J.) ("The absence of a medical opinion on the issue of equivalency does not defeat the ALJ's Step 3 finding[.]"), *report and recommendation adopted sub nom. Anderson v.*

*Berryhill*, No. 18-12334, 2019 WL 3892131 (E.D. Mich. Aug. 19, 2019)

(Michelson, J.).

### b.   Articulation requirements of medical equivalence

Plaintiff claims that the ALJ's failure to address Listing 11.02 in his decision

"leaves this Court to speculate as to whether the ALJ even considered whether the

elements of Listing 11.02 were or were not medically equaled."  (ECF No. 10,

PageID.506, 508-509.)  *See*, *e.g.*, *Hurst v. Sec'y of Health & Human Servs.*, 753

F.2d 517, 519 (6th Cir. 1985) ("[i]t is more than merely 'helpful' for the ALJ to

articulate reasons ... for crediting or rejecting particular sources of evidence. It is

absolutely essential for meaningful appellate review.") (quoting *Zblewski v.

Schweiker*, 732 F.2d 75, 78 (7th Cir. 1984)).  As for articulation requirements, SSR

17-2p states, in part:

> If an adjudicator at the hearings or AC level believes that the evidence
> already received in the record does not reasonably support a finding
> that the individual's impairment(s) medically equals a listed
> impairment, the adjudicator is not required to articulate specific
> evidence supporting his or her finding that the individual's
> impairment(s) does not medically equal a listed impairment.
> *Generally, a statement that the individual's impairment(s) does not
> medically equal a listed impairment constitutes sufficient articulation
> for this finding*.  An adjudicator's articulation of the reason(s) why the
> individual is or is not disabled at a <u>later step</u> in the sequential
> evaluation process will provide rationale that is sufficient for a
> subsequent reviewer or court to determine the basis for the finding
> about medical equivalence at step 3.

SSR 17-2P, 2017 WL 3928306, *4 (S.S.A. Mar. 27, 2017) (emphases added).

During the motion hearing, the Commissioner asked the Court to "infer the ALJ's reasoning from factual findings made elsewhere in the opinion[,]" and conclude that "the ALJ made sufficient factual findings elsewhere in his decision to support his conclusion at step three." *Forrest v. Comm'r of Soc. Sec.*, 591 F. App'x 359, 365-366 (6th Cir. Nov. 17, 2014), presumably by concluding that the RFC determination (R. at 14-16) cures or renders harmless any assumed omission at Step 3. *See also Dobbs v. Comm'r of Soc. Sec. Admin.*, No. 1:18-CV-11903, 2019 WL 4196505, at *5 (E.D. Mich. Aug. 19, 2019) (Patti, M.J.), *report and recommendation adopted sub nom. Dobbs v. Comm'r of Soc. Sec.*, No. 18-11903, 2019 WL 4189485 (E.D. Mich. Sept. 4, 2019) (Ludington, J.).

Yet, even if the Commissioner is correct that, under SSR 17-2p, the ALJ "was not required to specifically articulate the bases for his conclusion that Listing 11.02 was not medically equaled[,]" (ECF No. 14, PageID.545), where, as here, the ALJ did not discuss the listing in question, the Court "must determine whether the record evidence raises a substantial question as to [Claimant]'s ability to satisfy each requirement of the listing." *Smith-Johnson v. Comm'r of Soc. Sec.*, 579 F. App'x 426, 433 (6th Cir. 2014). "If a substantial question is raised, then it cannot be harmless error since the claimant could have been found disabled." *Smith-Johnson*, 579 F.App'x at 433 n.5 (citing *Reynolds*, 424 F. App'x at 416).

### c. Plaintiff has satisfied her burden.

Plaintiff contends it is "it is unreasonable to conclude that the ALJ' s articulation error was harmless, since the evidence *could* reasonably meet or equal the relevant Listing/Listings."  (ECF No. 10, PageID.510, 513; *see also* ECF No. 17, PageID.564-565.)  In addition to her testimony, Plaintiff supports her equivalency argument with references to medical records dated April 2017 – December 2018.  (ECF No. 10, PageID.509, 511-513; ECF No. 17, PageID.559-565.)[1]

### i.   The state agency opinion predates many of the relevant records and acknowledges the absence of a medical source opinion.

The Commissioner contends that the October 12, 2017 opinion of state agency consultant James Darden, M.D. "provides substantial evidentiary support for the ALJ's Step 3 finding."  (ECF No. 14, PageID.545-546; R. at 54-46, 64-66.)  Dr. Darden specifically expressly considered the listing for asthma (3.03) but also explained the assessed environmental limitations in terms of triggers for her migraine headaches and the effect of related-medication.  (R. at 58, 60, 68, 70.)

---

[1] To be clear, Plaintiff's statements of error do not challenge the ALJ's characterization of Dr. Qazi's MSS as "not persuasive."  (R. at 16; ECF No. 10, PageID.506, 513.)  *See*, *e.g.*, 20 C.F.R. §§ 404.1520c, 416.920c ("How we consider and articulate medical opinions and prior administrative medical findings for claims filed on or after March 27, 2017."). Instead, as suggested by her brief and consistent with oral argument, Plaintiff relies on the MSS as one of many pieces of evidence in support of her Listing 11.02 equivalency argument.  (*See* ECF No. 10, PageID.512-513.)

However, the ALJ cited Dr. Darden's opinion, ultimately finding it "somewhat persuasive" while acknowledging that "the updated record received at the hearing level documents the presence of additional severe impairments . . . ." (R. at 15-16.) Importantly, Dr. Darden's opinion would not have included consideration of Plaintiff's April 17, 2018 brain MRI (R. at 417), Dr. Qazi's August 16, 2018 notes (R. at 412), the December 2018 hospital visits (R. at 387-410), or the four Northwest Neurology visits in 2018 (R. at 442-445). (See ECF No. 17, PageID.564-565.) To complicate matters, it does not seem that Dr. Darden had access to Dr. Qazi's August 21, 2017 MSS (R. at 315-318, 450-453, 455-458), as the disability determination explanations (DDEs) state: "There is no indication that there is a medical opinion from any medical source." (R. at 59-60, 69-70.)

### ii. Plaintiff brought Listing 11.02 to the ALJ's attention and alternatively asked for a supplemental hearing with a medical expert.

In addition to the foregoing medical history, all of which was available to the ALJ, Plaintiff's counsel's closing remarks at the administrative hearing addressed the absence of a consultative examination, an apparently updated MSS (which the Court was unable to locate), equivalency of Listing 11.02 (based on severe, intractable migraines), and a supplemental hearing with a medical expert. (*See* R. at 21-22, 42-44, 292-458; *see also* R. at 37.)

15

Yet, with no mention of Plaintiff's equivalency argument or even a passing reference to Listing 11.02, the ALJ's decision summarily concludes that Plaintiff's impairments do not meet or medically equal the severity of a listed impairment, going so far as to state that "no acceptable medical source designated to make equivalency findings has concluded that the claimant's impairments medically equal a listed impairment."  (R. at 13.)  That Plaintiff brought Listing 11.02 to the ALJ's attention and alternatively requested a supplemental hearing with a medical expert weakens the Commissioner's argument that "the record does not contain any acceptable medical source's detailed description of a typical headache event and all associated phenomena."  (ECF No. 14, PageID.540.)

        iii.     **Record evidence supports the request for a medical expert's opinion on Listing 11.02(B) equivalence.**

Listing 11.02(B) is epilepsy characterized by "[d]yscognitive seizures (see 11.00H1b), occurring at least once a week for at least 3 consecutive months (see 11.00H4) despite adherence to prescribed treatment (see 11.00C)."  As to the first requirement, the Court notes Plaintiff's references to fainting and hallucinations. (ECF No. 10, PageID.509, 516, 517.)  Plaintiff contends that her migraines "could reasonably produce symptoms of *similar severity* of medical equivalence . . . , to include the need to lay down and nap when a migraine strikes, severe head pain, confusion, difficulty concentrating, light and sound sensitivity, nausea and/or

16

vomiting."  (ECF No. 17, PageID.561 n.2 (emphasis added).)  Dyscognitive

seizures "are characterized by *alteration of consciousness* without convulsions or

loss of muscle control.  During the seizure, blank staring, change of facial

expression, and automatisms (such as lip smacking, chewing or swallowing, or

repetitive simple actions, such as gestures or verbal utterances) may occur."

Listing 11.00H1b (emphasis added).  The Commissioner argues that the medical

records "reflect that Plaintiff consistently had no neurological or psychological

symptoms when presenting for treatment of her migraine headaches[,]" and that

"the record does not document that she was ever actually treated for loss of

consciousness."  (ECF No. 14, PageID.542.)  Still, in May 2017 and June 2017,

Dr. Alkhalil noted "Cataplexy and occasional hypnagogic and hypnopompic

hallucination."  (R. at 302, 306, 369.)  Even if there were occasions in July 2017

and late 2018 when she denied hallucinations (R. at 325, 353, 436), she saw her

neurologist in February 2018 for "[s]evere migraines with fainting spells and

feeling unbalanced."  (R. at 445.)  Moreover, while the results of her neurological

examinations at Beaumont Hospital were largely normal (R. at 325, 326, 339, 341,

353, 355, 390, 401), in December 2017, they were "Positive for dizziness and

headaches[,]" although "[n]egative for weakness[,]" (R. at 388, 398), and, in

January 2018, as for "[e]xtreme dizziness," Dr. Qazi noted that the "CAT scan at

Beaumont did not show any acute injury."  (R. at 415.)  All of this raises a

substantial question on the issue of "similar severity of medical equivalence."
(ECF No. 17, PageID.561 n.2.)

As to the frequency requirement, Plaintiff has identified a potential flaw in the ALJ's statements that Plaintiff "has not followed-up regularly with a neurologist . . . [,]" "eventually followed-up with her neurologist in February 2018 . . . [,]" and "has . . . only sporadically followed-up with her neurologist over the past year . . . ." (R. at 14, 15, 16.) Listing 11.02(B) requires "at least once a week for at least 3 consecutive months[.]" Listing 11.00H4. The Commissioner contends that there were "just seven visits to medical providers for medical treatment for migraines over the roughly two-year period . . ." prior to the ALJ's March 27, 2019 decision and that "fainting 'on a few occasions' is on its face not equivalent to the frequency required by either Listing 11.02(B) or 11.02(D)." (ECF No. 14, PageID.540-542.) However, in addition to the aforementioned 3 hospital visits in 2017, the 4 visits to a neurological specialist over a 10-month period from February 2018 to December 2018 raises a substantial question on the issue of frequency, especially where Plaintiff's testimony suggests that sometimes her medication works (R. at 33).

Finally, Plaintiff has identified a flaw in the ALJ's comments on "adherence to prescribed treatment." Listing 11.00C. To be sure, the ALJ noted that "did not follow through" on the recommendation for Aimovig (R. at 15), and the

Commissioner makes the same observation on the issue of adherence to prescribed treatment.  (ECF No. 14, PageID.541-542; R. at 15, 443, 444.)  However, this same argument is plagued by references to pre-onset date records from 2014 and 2015. (*Id*.)  Relatedly, and purportedly considering "relevant evidence," the ALJ's consideration of the July 2014 and April 2017 records is evident from the citations to Exhibits 1F and 4F.  (R. at 14, 297-299, 332-348.)  As Plaintiff notes, the July 2014 / August 2015 records to which the Commissioner's brief refers (*see* R. at 297-299, 446-447) occurred well before the May 2017 onset date, and, thus, "is flawed and unfair to the Plaintiff who has been routinely noted to be compliant with medication[,]" an argument she supports with references to the February 2018 – December 2018 Northwest Neurology records (R. at 442-445).  (ECF No. 14, PageID.541-551, ECF No. 17, PageID.560-561.)  This raises a substantial question as to adherence.

### iv.    Conclusion

According to the Commissioner, "[t]he dearth of medical evidence corresponding to the requisite criteria of Listing 11.02 belies Plaintiff's suggestion that the ALJ committed any error at Step 3."  (ECF No. 14, PageID.546.) However, based on the record before it, the Undersigned – a non-medical professional – is not in a position to determine whether "a preponderance of evidence supports the ALJ's equivalency finding" as to Listing 11.02(B).  *Jammer*,

2019 WL 1372171, at *7.  The record evidence on severity, frequency, and adherence, coupled with counsel's direct request, merited, at least, an express consideration of Listing 11.02 and a more robust explanation of equivalency, if not also a medical expert's opinion on Listing 11.02 equivalence.  In sum, but keeping in mind Plaintiff's withdrawal of her Listing 11.02(D) argument, Plaintiff has raised a substantial question that her impairment medically equals Listing 11.02(B).  Thus, the error cannot be harmless.  *Smith-Johnson*, 579 F.App'x at 433 n.5

### 5.   Plaintiff has not shown reversible error in the ALJ's consideration of subjective symptoms.

Plaintiff challenges the ALJ's subjective symptoms evaluation.  (ECF No. 10, PageID.513-519.)  Plaintiff's subjective symptoms are reflected in, among other things, her July 22, 2017 function report (R. at 219-226) and her March 6, 2019 administrative hearing testimony (R. at 27-38).  At the administrative hearing, Plaintiff testified that she gets migraines 6 times per week and, on average, they last 30-45 minutes.  (R. at 31, 36.)  When she takes the medication, it puts her to sleep.  (R. at 31.)  She has "to lay down because it's so strong[,]" and, on average, she needs to lay down about 2-3 hours before she can function again; she does not know when she is going to get one.  (R. at 36.)  Sometimes the medication does not work, "so when [she goes] to the emergency room they have to give [her] a shot and then it just works better so [she has] been for that and the

fainting like blackout." (R. at 33.) Plaintiff's counsel's examination of the VE

included a single hypothetical, which was based on falling asleep, being off-task

20% or more, and the effects on co-workers of falling at a work station. (R. at 41-

42.)

Nonetheless, the ALJ adopted an RFC that was largely consistent with the

ALJ's hypothetical to the VE. (*Compare*, R. at 14, *with* R. at 40.)[2] The ALJ's

RFC discussion adequately explains his finding that Plaintiff's "statements

concerning the intensity, persistence and limiting effects of [her alleged] symptoms

are not entirely consistent with the medical evidence and other evidence in the

record[,]" *see* 20 C.F.R. §§ 404.1529(a), 416.929(a), and his conclusion that "the

claimant's subjective complaints do not warrant any additional limitations beyond

those established in the aforementioned residual functional capacity." (R. at 14-

16.) The ALJ's consideration of "other evidence," as contemplated by 20 C.F.R.

§§ 404.1529(c)(3), 416.929(c)(3), was informed by, at the very least, Plaintiff's

daily activities (Subsection (c)(3)(i)), medication she takes to alleviate her pain or

other symptoms (Subsection (c)(3)(iv)), measures she uses to relieve her pain or

---

[2] The hypothetical also noted that Plaintiff "cannot work with the public[,]" a
limitation which is not included in the RFC. (*Id*.) Yet, even though Plaintiff's
motion quotes this portion of the ALJ's hypothetical (ECF No. 10, PageID.503),
this appeal is about physical impairments (ECF No. 17, PageID.563).

other symptoms, such as laying down (Subsection (c)(3)(vi)), and her failure to avail herself of the recommended Aimovig (R. at 15). (*See also* SSR 16-3p.)

Plaintiff has failed to illustrate how the ALJ's consistency determination was errant, and the Court has no difficulty tracing the path of the ALJ's reasoning. She has the burden of proof on this issue. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The ALJ's consistency determination is entitled to great deference. "[A]n assertion of error in a credibility/consistency determination requires a particularly strong showing by a plaintiff." *Redmond v. Comm'r of Soc. Sec.*, No. 1:18-CV-345, 2019 WL 3980715, at *5 (S.D. Ohio Aug. 23, 2019), *report and recommendation adopted*, No. 1:18CV345, 2019 WL 4345704 (S.D. Ohio Sept. 12, 2019). Further, "a credibility/consistency determination cannot be disturbed 'absent a compelling reason.' Thus, it is proper for an ALJ to discount the claimant's testimony where there are inconsistencies and contradictions among the medical records, her testimony, and other evidence." *Redmond*, 2019 WL 3980715, at *5 (internal and external citations omitted). *See also Bryant v. Comm'r of Soc. Sec.*, No. 3:19-CV-0079, 2019 WL 5684456, at *12 (N.D. Ohio Nov. 1, 2019). Accordingly, the Court declines to overturn the Commissioner's consistency determination.

## II.   ORDER

Accordingly, Plaintiff's motion for summary judgment (ECF No. 10) is

**GRANTED IN PART** and **DENIED IN PART**, Defendant's motion for summary

judgment (ECF No. 14) is **GRANTED IN PART** and **DENIED IN PART**, the

decision of the Commissioner of Social Security is **REVERSED IN PART**, and

this matter is **REMANDED** to the Commissioner of Social Security for a new

hearing, at which the ALJ shall re-evaluate Plaintiff's impairments at Step 3,

including a robust discussion of Listing 11.02(B) equivalency with a focus on the

relevant period.  In so doing, the ALJ should give serious consideration to the

utility of an opinion from an acceptable medical source as to whether Plaintiff's

impairments equal Listing 11.02(B) and a hearing at which the parties can cross-

examine the acceptable medical source on Plaintiff's impairments' equivalency to

Listing 11.02(B).  If the analysis continues past Step 3, then the ALJ may, if

warranted and at his/her option, also: (1) re-evaluate Plaintiff's impairments and

restrictions at Step 4, including reconsideration of her migraines, in combination

with her previously diagnosed narcolepsy and the adjustments to and effects of her

medications; (2) make any corresponding adjustments to Plaintiff's RFC; and (3)

adjust the hypotheticals and Step 5 analysis as necessary.

**IT IS SO ORDERED.**

Dated: April 21, 2020                    s/*Anthony P. Patti*
                                         Anthony P. Patti
                                         UNITED STATES MAGISTRATE JUDGE